**FINANCIAL INSTITUTIONS RETIREMENT FUND, Plaintiff–Appellee,**

**Federal Home Loan Bank of Boston; Federal Home Loan Bank of New York; Federal Home Loan Bank of Pittsburgh; Federal Home Loan Bank of Atlanta; Federal Home Loan Bank of Cincinnati; Federal Home Loan Bank of Indianapolis; Federal Home Loan Bank of Chicago; Federal Home Loan Bank of Chicago; Federal Home**

Loan Bank of Des Moines; Federal Home Loan Bank of Dallas; Federal Home Loan Bank of Topeka; Federal Home Loan Bank of San Francisco and Federal Home Loan Bank of Seattle, Intervenor–Plaintiffs–Appellees,

v.

OFFICE OF THRIFT SUPERVISION and T. Timothy Ryan, Director, Office of Thrift Supervision, Defendant–Counter–Claim–Plaintiffs–Appellants,

Thomas A. BARNES; Barry S. Burke; Ronald B. Carreker; Charles A. Deardorff; Allen Dermody; William J. Durbin; Jane Marie Johnson; Ronald R. Lake and Penny D. Marshall, Counter–Claim–Plaintiffs–Appellants,

v.

James R. FAULSTICH; Ronald R. Morphew; John W. Bagwill, Jr.; George M. Barclay; John A. Becker; J.C. Benage; Leo B. Blaber, Jr.; Larry J. Brandt; James M. Cirona; Stephen E. Clear; Ramiro Luis Colon, Jr.; Thurman C. Connell; Brian D. Dittenhafer; Charles T. Firth; William H. Glencorse; Lyle R. Grimes; Michael A. Jessee; Jerry H. Lassiter; Frank A. Lowman; Ellen Ann Roberts; James D. Roy; Robert E. Showfety; Robert F. Stoico; Charles L. Thiemann; Norman L. Tirey; Roy E. Webber; Richard L. White and John B. Zanetti, individually and as Directors of the Financial Institutions Retirement Fund, Counterclaim–Defendants–Appellees.

No. 929, Docket 91–7906.

United States Court of Appeals,
Second Circuit.

Argued March 30, 1992.

Decided May 15, 1992.

■■■■■■

William F. Hanrahan, Washington, D.C. (Gary M. Ford, Lonie Hassel, Lincoln Weed, Groom and Nordberg, Chtd., Harris Weinstein, Dwight C. Smith, Office of Thrift Supervision, Washington, D.C., of counsel) for appellants.

Thomas C. Morrison, New York City (Patterson, Belknap, Webb & Tyler, New York City, Robert D. Alin, Financial Institutions Retirement Fund, White Plains, N.Y., of counsel) for plaintiffs-appellees.

Charles Lee Eisen, Washington, D.C. (Christopher M. McMurray, Kirkpatrick & Lockhart, Washington, D.C., William T. Cullen, Kirkpatrick & Lockhart, Pittsburgh, Pa., of counsel) for intervenor-plaintiffs-appellees.

Before MINER and McLAUGHLIN, Circuit Judges, and AMON, District Judge.[*]

McLAUGHLIN, Circuit Judge:

This is a dispute over a surplus accumulated by the Financial Institutions Retirement Fund (the "Fund"), a multiple employer pension fund established in 1943 to serve financial institutions. The disputed portion of the Fund's surplus relates to contributions made by the twelve Federal Home Loan Banks (the "Banks") to fund the retirement benefits of approximately 2,500 former employees who were transferred to the Office of Thrift Supervision ("OTS") pursuant to statute. After the employees were transferred, both OTS and the Banks claimed the surplus. The Fund allocated it to the Banks and then sued in the District Court for the Southern District of New York (Goettel, *Judge* ) for a declaration that the allocation was proper. OTS, joined by intervening participants in the Fund, counterclaimed against the Fund's directors for breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988). The district court granted summary judgment for the Fund and the Banks, holding that the Banks were entitled to the disputed surplus, and that the Fund's directors did not breach their fiduciary duties by allocating the surplus to the Banks. *See Financial Insts. Retirement Fund v. Office of Thrift Supervision,* 766 F.Supp. 1302 (S.D.N.Y. 1991). We agree with these conclusions but write to clarify a participant's[1] standing to sue for breaches of fiduciary duty under ERISA.

## BACKGROUND

The Banks were established in 1932 pursuant to the Federal Home Loan Bank Act, ch. 522, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C. §§ 1421–1449 (1988 & Supp.1990)), and collectively are owned by federally insured savings institutions. The Banks provide liquidity to the thrift industry and, until recently, they also supervised and examined savings associations. When the thrift industry was deregulated in the early 1980s, self-regulation proved disastrous; inadequate "supervision and examination of thrifts was one of the primary causes of the thrift crisis." H.R.Rep. No. 54, 101st Cong., 1st Sess. 301 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 97. *See generally* Annual Survey of Financial Institutions and Regulation, The S & L Crisis: Death and Transfiguration, 59 Fordham L.Rev. S1–S459 (1991) (overview of the thrift crisis).

Congress responded to the S & L debacle by overhauling regulation of the industry. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIR-

---

[*] Honorable Carol Bagley Amon of the United States District Court for the Eastern District of New York, sitting by designation.

[1] The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7) (1988). We use the term "participant" and "employee" interchangeably when referring to the intervenors.

REA"), Pub.L. No. 101–73, 103 Stat. 183 (1989) (principally codified at scattered sections of 12 U.S.C.). FIRREA stripped the Banks of their supervisory and examination functions and vested them in OTS. Accordingly, FIRREA mandated that some 2,500 Bank employees involved in regulatory activities be transferred to OTS and become federal employees. *See* FIRREA §§ 403(c) & 722(a), 103 Stat. 361, 426, *reprinted at* 12 U.S.C. § 1437 note (Supp. 1990). OTS therefore became responsible for paying these employees and funding their retirement benefits. *See id.* § 723(b), 103 Stat. 428, *reprinted at* 12 U.S.C. § 1437 note (Supp.1990). Before the transfer, OTS made arrangements to join the Fund as a participating employer so that the transferred employees could continue to accrue benefits in the Fund.

Before OTS came into the picture, the Fund had already accumulated a surplus, *i.e.*, its assets exceeded the actuarially determined present value of pension benefits accrued by employee-participants. This surplus was generated when the Fund's investments performed better than had been projected. Proving once again that no good deed goes unpunished, this enviable surplus position created an anomalous situation for the Fund under then-prevailing law. Consideration of this irony requires us to make a brief detour into the Byzantine world of pension plan accounting and funding.

Prior to 1988, multiple employer pension funds were treated for tax and funding purposes as though they were single employer plans. *See, e.g.*, 26 U.S.C.A. §§ 413(c)(4) & (6) (1988) (amended 1988) (minimum funding standards and deductibility of contributions to multiple employer plans "determined as if all participants in the plan were employed by a single employer"). Thus, a multiple employer plan could not require its participating employers to make additional contributions to a fully funded plan and indeed any such contributions would not be tax deductible. *See id.* § 404(a)(1)(A)(i). This had two perverse results (each contrary to ERISA's goals): first, it allowed employers who, on an employer-by-employer basis, were actually *underfunded* to free-ride on the plan's surplus. Second, it provided employers who, on an employer-by-employer basis, were *overfunded* with an incentive to withdraw from the plan to capture their surpluses.[2]

Recognizing the absurdity of the law, the Fund endeavored to change it by lobbying Congress. At the same time, the Fund calculated the surplus amounts attributable to each employer based on its contributions to the Fund and its projected liabilities for its participating employees. The amount of the surplus attributable to each employer was denominated as a Future Employer Contribution Offset ("FECO"); FECO is simply an accounting entry indicating an employer's share of the Fund's surplus.

Congress finally responded by amending the Code to permit[3] existing multiple employer plans to treat participating employers as maintaining separate accounts for funding purposes. *See* Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 6058, 102 Stat. 3342, 3698–99 (1988) (codified at 26 U.S.C. § 413(c)); *see also* H.R.Rep. No. 1104, 100th Cong., 2d Sess. 159 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 5048, 5220 (funding position of each employer calculated by comparing "the assets and liabilities that would be allocated to a plan maintained by the employer if the employer withdrew from the multiple employer plan"). This allowed the Fund's participating employers with FECO balances to take a credit for their share of the Fund's surplus in lieu of making actual contributions for their current benefit obligations. Em-

---

**2.** Though exceedingly complex, it was possible for a participating employer to withdraw from the Fund and set up a single employer plan, seizing its share of the Fund's surplus in the process. This is contrary to ERISA's goal of encouraging the growth and maintenance of multiple employer plans and discouraging employer withdrawal from such plans. *See Ben*

*Hur Constr. Co. v. Goodwin*, 784 F.2d 876, 878–79 (8th Cir.1986).

**3.** For plans established after December 31, 1988, the statute *requires* that each employer be treated as maintaining a separate plan for funding purposes. *See* 26 U.S.C. § 413(c)(4)(A) (1988).

ployers with FECO balances could therefore forego making cash contributions to the Fund until they had reduced their FECO balances to zero.

All of the Banks enjoyed FECO balances when FIRREA became effective and mandated the transfer of approximately 2,500 employees to OTS. As of April 1, 1990, OTS became responsible for the pay and benefits of these transferred employees. *See* FIRREA § 723(b), 103 Stat. at 428, *reprinted in* 12 U.S.C. § 1437 note (Supp. 1990). When the Fund billed OTS in June 1990 for its contributions on behalf of the transferred employees, OTS refused to pay, demanding that a portion of the Banks' FECO balances be allotted to OTS. OTS took the position that the $21 million of the Banks' FECO balances attributable to the transferred employees should, like so much baggage, "follow" the employees to OTS. Not surprisingly, the Banks objected, arguing that since they had contributed the monies that created the surplus, the surplus was theirs.

On October 23, 1990, the Fund convened a meeting of a Special Committee of its Board of Directors to address the dispute. The Special Committee comprised twelve board members unaffiliated with the Banks.[4] The Special Committee debated the views of OTS and the Banks and, acting on the advice of the Fund's outside counsel, concluded that OTS was not entitled to any portion of the Fund's surplus.

The Fund initiated this lawsuit the following day, seeking a declaration "that neither ERISA nor FIRREA require[d] the Fund to transfer to OTS any portion of the FECO balances credited to the [Banks]." The Banks intervened as co-plaintiffs in the action to press the same claim. Before OTS filed its answer, the Fund and the Banks moved for summary judgment.

OTS then answered and asserted counterclaims alleging that the Fund's directors breached their fiduciary duties under ERISA. Several OTS employees who had been transferred from the Banks pursuant to FIRREA then moved to intervene as counterclaim-plaintiffs to join in OTS's claims for breach of fiduciary duty.

The district court granted plaintiffs' summary judgment motions, holding that the Banks were entitled to the disputed FECO balances. Judge Goettel also granted plaintiffs' motions to dismiss the counterclaims, holding (1) that neither OTS nor its intervening employees had standing to assert these claims for breach of fiduciary duty, and (2) that the Fund's directors had not breached their fiduciary duties in any event.

Although we agree that the Banks were entitled to the FECO accounts and that the Fund's directors did not breach their fiduciary duties, and therefore affirm the judgment of the district court, we disagree with the district court's alternative holding that the intervening employees[5] lacked standing to assert a claim for breach of fiduciary duty under these circumstances.

## DISCUSSION

We turn first to a brief examination of the labyrinthine doctrine of standing. Because "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents," *International Primate Protection League v. Administrators of Tulane Educ. Fund,* —— U.S. ——, ——, 111 S.Ct. 1700, 1704, 114 L.Ed.2d 134 (1991), we then consider the sections of ERISA invoked by the participants' counterclaims. Finally, we examine

---

**4.** The full Board of Directors also included the presidents of each of the twelve Banks and the Fund's full-time president.

**5.** OTS does not contest Judge Goettel's finding that it does not have standing under ERISA to maintain an action for breach of fiduciary duty. *See* 766 F.Supp. at 1308 n. 6; *accord Tuvia Convalescent Ctr., Inc. v. National Union of Hosp. & Health Care Employees,* 717 F.2d 726,

730 (2d Cir.1983); *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts,* 954 F.2d 299, 302 (5th Cir.1992); *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 987–88 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990); *Kwatcher v. Massachusetts Serv. Employees Pension Fund,* 879 F.2d 957, 959–60 (1st Cir.1989); *Plucinski v. I.A.M. Nat'l Pension Fund,* 875 F.2d 1052, 1056 (3rd Cir.1989).

their " 'allegations to ascertain whether the[se] particular plaintiff[s] [are] entitled to an adjudication *of the particular claims asserted.' " Id.* (quoting *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984) (emphasis added)).

*Standing*

■ "The term 'standing' subsumes a blend of constitutional requirements and prudential considerations...." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *see also Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975) (standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise"). The Supreme Court has developed three requirements for establishing Article III standing: "[a] plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324; *see also* Erwin Chemerinsky, Federal Jurisdiction 51–71 (1989) (discussing constitutional elements of standing doctrine).

The Court has also articulated a closely related set of prudential principles that limit the circumstances under which federal courts may exercise their jurisdiction. *See Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–06; *Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. The prudential contours of the standing doctrine need not detain us, however, because "Congress may override prudential limits by statute", Chemerinsky, *supra,* at 52; *see, e.g., Warth,* 422 U.S. at 501, 95 S.Ct. at 2206 ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules"); *Sierra Club v. Morton,* 405 U.S. 727, 732 & n. 3, 92 S.Ct. 1361, 1364 & n. 3, 31 L.Ed.2d 636 (1972) (same), and ERISA clearly accomplishes this result. *See* 29 U.S.C. § 1132(a) (1988) (enumerating

persons empowered to bring a civil action under ERISA).

Although Congress may not dispense with the dictates of Article III, *see Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Id.* at 500, 95 S.Ct. at 2205 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1149 n. 3, 35 L.Ed.2d 536 (1973)); *see also Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 152, 71 S.Ct. 624, 638, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("standing may be based on an interest created by the Constitution or a statute"). The crucial issue in this case then is whether the intervening employee-participants have pleaded a violation of their ERISA-created rights sufficient to satisfy Article III's injury requirement. The district court held that they did not, intimating that injuries cognizable under ERISA must entail at least some risk to plan assets. *See* 766 F.Supp. at 1309 (participants lack standing to challenge FECO allocation because potential risk of loss to plan assets from this decision is remote). We think the statute casts a wider net.

*ERISA*

ERISA explicitly provides that a civil action may be brought:

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

29 U.S.C. § 1132(a) (1988). Through its incorporation of both section 1109 [6] and the

---

**6.** Section 1109 provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such

provisions of Subchapter I of ERISA, *see id.* §§ 1001–1168, which includes the statute's other fiduciary duty provisions, section 1132 essentially empowers beneficiaries to bring a civil action to redress *any* violation of the statute's fiduciary requirements.

One such provision is ERISA section 404,[7] the statute's general fiduciary duty proviso which codifies a trustee's common law duties of skill and loyalty. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989); *Leigh v. Engle,* 727 F.2d 113, 122–23 (7th Cir.1984); H.R.Rep. No. 533, 93rd Cong., 2d Sess. 11 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4649. Judge Friendly has observed that this section requires that plan fiduciaries make their decisions "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.) (Friendly, J.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Neither the Fund nor the Banks dispute that the directors are fiduciaries and that "ERISA imposes a high standard on fiduciaries." *Beck v. Levering,* 947 F.2d 639, 641 (2d Cir.1991) (per curiam). Rather, they contend that allocation of the FECO balances did not trigger the directors' fiduciary duties because these obligations attach only to acts that affect plan assets. *See, e.g., Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1158 (3d Cir.1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions."). Although the district court's opinion is not entirely clear, it apparently agreed with this assertion, holding that the intervenors

did not have standing to challenge the FECO allocation because the risk to plan assets that this decision posed was remote. *See* 766 F.Supp. at 1309. This interpretation is too cramped a view of the scope of ERISA's fiduciary duty provisions.

We agree that if the FECO balances were considered to be plan assets, their disposition would clearly trigger ERISA's fiduciary duties. *See* 29 U.S.C. § 1002(21)(A)(i) (1988); *see, e.g., Leigh,* 727 F.2d at 122 (trustee who improperly risks plan assets breaches his fiduciary duty). We need not decide whether the FECO balances were plan assets, however, because a person is also a fiduciary to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or .... he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) & (iii); *see also Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142–43, 105 S.Ct. 3085, 3090–91, 87 L.Ed.2d 96 (1985) (fiduciary duties "relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest"); *O'Neill v. Davis,* 721 F.Supp. 1013, 1015 (N.D.Ill.1989) ("disposition of Plan assets is not necessary in order for the fiduciary duty to arise"). There can be no doubt that the Fund's directors were administering or managing the plan when they decided to allocate the FECO balances to the Banks. Accordingly, they were bound to make that decision consistent with ERISA. *Compare Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1416–17 (2d Cir.1985) (trustee not a fiduciary when he does not

---

fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. 29 U.S.C. § 1109(a) (1988).

7. Section 404 provides in relevant part:
   (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.
29 U.S.C. § 1104(a)(1) (1988).

act in his capacity as plan administrator), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). This broad view of participant standing under ERISA is further supported by ERISA's goal of deterring fiduciary misdeeds. *Cf. Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 260 (2d Cir.1989) (granting takeover targets standing to sue under the Clayton Act enhances private enforcement of antitrust laws).

Having determined (1) that a violation of the directors' ERISA-imposed fiduciary duties would "injure" the intervening participants, and (2) that ERISA's fiduciary duty provisions are more comprehensive than envisioned by the district court, we now consider whether the intervenors have pleaded violations of their ERISA created rights. In so doing, we are mindful "that when standing is challenged on the basis of the pleadings, we 'accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party.' " *Pennell v. City of San Jose,* 485 U.S. 1, 7, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206) (deletion in original).

In their complaint, the intervenors alleged that the Fund's directors, including the non-Bank directors, allowed the Banks' interests to influence their decision in allocating the disputed FECO balances; that this decision was tainted by a conflict of interest; and that the decision was the result of an inadequate and uninformed deliberative process. These facts, which the district court was obliged to accept as true in order to rule on plaintiffs' motion to dismiss for lack of standing, sufficiently allege violations of ERISA section 404 to establish that the plan participants have been injured within the meaning of the statute and therefore also within the meaning of Article III. The district court's holding to the contrary was erroneous.

■ This conclusion does not affect the judgment of the district court, however, because we agree with Judge Goettel's alternative holding that the Fund's directors did not breach their fiduciary duties. We

also agree that the Banks, not OTS, were entitled to the disputed FECO balances. As to these bases for the district court's judgment, we affirm substantially for the reasons set forth in Judge Goettel's thorough opinion, 766 F.Supp. 1302.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.