**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3045

_____

| | |
|---|---|
| Hawkeye National Life Insurance Company, | * |
| | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| AVIS Industrial Corporation; Edgerton Forge, Inc., | * |
| | * |
| | * Appeal and Cross-Appeal from the |
| Appellants, | * United States District Court for the |
| | * Southern District of Iowa. |
| Steel Technologies, Inc.; Midwest Plating and Chemical Corporation, | * |
| | * |
| | * |
| Defendants, | * |
| | * |
| Metal Polishers, Buffers, Platers and Allied Workers International Union; Metal Polishers, Buffers, Platers and Allied Workers International Union, Local 15; Metal Polishers, Buffers, Platers and Allied Workers International Union, Local 24; Metal Polishers, Buffers, Platers and Allied Workers International Union, Local 301; Metal Polishers, Buffers, Platers and Allied Workers International Union, Local 305, | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Appellees. | * |

_____

No. 96-3097

_____

Hawkeye National Life Insurance     *
Company,     *
    *
        Plaintiff,     *
    *
        v.     *
    *
AVIS Industrial Corporation; Edgerton     *
Forge, Inc.,     *
    *
        Appellees,     *
    *
Steel Technologies, Inc.; Midwest     *
Plating and Chemical Corporation,     *
    *
        Defendants,     *
    *
Metal Polishers, Buffers, Platers and     *
Allied Workers International Union;     *
Metal Polishers, Buffers, Platers and     *
Allied Workers International Union,     *
Local 15; Metal Polishers, Buffers,     *
Platers and Allied Workers International     *
Union, Local 24; Metal Polishers,     *
Buffers, Platers and Allied Workers     *
International Union, Local 301; Metal     *
Polishers, Buffers, Platers and Allied     *
Workers International Union, Local 305,     *
    *
        Appellants.     *

_____

Submitted: March 12, 1997
Filed: July 28, 1997
_____

Before MAGILL[1] and MURPHY, Circuit Judges, and GOLDBERG,[2] Judge.
_____

MAGILL, Circuit Judge.

Hawkeye National Life Insurance Company (Hawkeye), the administrator of the Metal Polishers, Buffers, Platers and Allied Workers International Union Pension Plan (Plan), brought this declaratory judgment action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (1994 & Supp. 1995). Hawkeye seeks declaratory relief for its decision to distribute the Plan's remaining assets to AVIS Industrial Corporation (AVIS) and Edgerton Forge, Inc. (Edgerton). In its action for declaratory relief, Hawkeye named AVIS, Edgerton, Steel Technologies, Inc. (Steel Technologies), and Midwest Plating and Chemical Corporation (Midwest) (collectively, the employers) as defendants. In addition, Hawkeye named as defendants the various local chapters of the Metal Polishers, Buffers, Platers, and Allied Workers International Union (collectively, the Union) to which the Plan participants, the employees, belong. Hawkeye filed a motion for summary judgment in

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]THE HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

which AVIS and Edgerton joined. After unsuccessfully arguing that consideration of Hawkeye's summary judgment motion should be deferred, the Union filed a cross-motion for summary judgment, seeking a declaratory judgment that

the remaining Plan assets should inure to the benefit of Plan participants. Ruling that 29 U.S.C. § 1103(c)(1) (1994) barred distribution of the remaining Plan assets to one or more Plan employers, the district court granted the Union's cross-motion for summary judgment and denied Hawkeye's motion for summary judgment. AVIS and Edgerton appeal, and the Union cross-appeals. We affirm in part, reverse in part, and remand.

## I.

The Plan was established in 1971 as a multiemployer employee benefit plan. The employers that took part in the Plan were Edgerton, Steel Technologies, Midwest, North Vernon Forge, Inc. (North Vernon Forge), and North Vernon Steel Products, Inc. (North Vernon Steel). At all times relevant to this appeal, Hawkeye served as the Plan administrator, and Bruce & Bruce Company (Bruce & Bruce) served as the consulting actuary for the Plan. Pursuant to § 8.5(b) of the Plan, Hawkeye has the authority "to construe and interpret the Plan . . . ." Metal Polishers, Buffers, Platers and Allied Workers International Union Pension Plan, as amended (Jan. 1, 1986) (Plan) § 8.5(b), reprinted in Appellants' App. at 38. In addition, the Plan provides that the Union, Hawkeye, and each of the employers are fiduciaries of the Plan "with respect to the specific responsibilities of each for Plan administration . . . ." Plan § 2.19, reprinted in Appellants' App. at 12.

AVIS never contributed to or took part in the Plan. However, according to the affidavit of AVIS's chief financial officer, Carol J. Mineart, AVIS acquired three

employers that were part of the Plan: Edgerton, North Vernon Steel, and North Vernon Forge. Carol J. Mineart Aff. (Apr. 18, 1996) at ¶¶ 3-4, reprinted in Appellants' App. at 71-72. Mineart also testified that AVIS assumed all the liabilities of the acquired companies, including each employer's obligations under the Plan. Id. at ¶ 5, reprinted

*in* Appellants' App. at 72.  Consequently, according to Mineart, AVIS is the successor in interest to these three companies.  *Id.* at ¶ 3, *reprinted in* Appellants' App. at 71.[3]

The Plan was funded entirely by the employers.  *See* Plan § 7.6, *reprinted in* Appellants' App. at 36. Collective bargaining agreements that each employer reached with the Union specified the amount of each employer's contributions.  *Id.*  According to the provisions of the Plan, these contributions were determined at least in part by the actuarial calculations of Bruce & Bruce.  Pursuant to the Plan, Bruce & Bruce was to calculate the Plan's expected actuarial requirements and, based on these calculations, make recommendations as to the contributions that the employers should be required to make in order to insure that the Plan remained fully funded.  *See* Plan § 7.2, *reprinted in* Appellants' App. at 35.  As provided by the Plan, each employee's benefits were based on the length of that employee's service as well as the monthly pension rate set forth in the applicable collective bargaining agreement reached between the employers and the Union. *See* Plan §§ 2.1, 2.22, 5.1, *reprinted in* Appellants' App. at 10, 13, 21.

Over time, the individual employers withdrew from the Plan:  Midwest withdrew on March 21, 1985;  Steel

---

[3]In their brief, AVIS and Edgerton further explain that "North Vernon Forge and North Vernon Steel Products no longer have any corporate status; they were dissolved as corporate entities in connection [with] their acquisition by AVIS.  Edgerton continues to exist as a wholly-owned subsidiary of AVIS; [Edgerton's] participation in this appeal arises solely out of this capacity."  Appellants' Br. at 6 n.5.

Technologies withdrew on June 24, 1988; and North Vernon Forge and Edgerton both withdrew on August 31, 1988. As a result, as of August 31, 1988, North Vernon Steel was the sole remaining employer in the Plan. On December 31, 1989, sixteen months later, North Vernon Steel also withdrew from the Plan. With North Vernon Steel's withdrawal, the Plan as a whole terminated.

Under the terms of the Plan, the withdrawal of each employer resulted in a partial termination of the Plan. See Plan § 12.2, reprinted in Appellants' App. at 43. With each withdrawal, the Plan required Hawkeye and Bruce & Bruce to "allocate and segregate for the benefit of the affected Participants with respect to which the Plan is being terminated the proportionate interest of such Participants in the Pension Fund." Id. The Plan further required that such segregated funds "be liquidated (after provision is made for the expenses of liquidation) by the payment or provision for the payment of [employee] benefits" in a specified order of preference. Plan § 12.3, reprinted in Appellants' App. at 43.

In addition to insuring that Plan liabilities were paid in the event of a partial termination, the Plan also specified how assets remaining in the Plan were to be distributed. Specifically, § 12.6 provided that:

> In no event shall the Employer receive any amounts from the Pension Fund upon termination of the Plan, except that, and notwithstanding any other provision of the Plan:
>
> (a) The Employer shall receive such amounts, if any, as may remain after the satisfaction of all liabilities of the Plan and arising out of any variations between actual requirements and expected actuarial requirements, and
>
> (b) The amount, if any, received by the Employer does not contravene any provision of law.

-9-

Plan § 12.6, <u>reprinted in</u> Appellants' App. at 44.  The Plan further provided that, if the withdrawing employer expressly elected not to receive such surplus amounts, those amounts would be distributed to Plan participants of the withdrawing employer as long as the Plan as a whole remained fully funded.  <u>See</u> Amendment to Metal Polishers, Buffers, Platers and Allied Workers International Union Pension Plan, as amended (June 6, 1988) (Plan Amendment) § D, <u>reprinted in</u> Appellants' App. at 47.

The chief actuary for Bruce & Bruce, S.A. Vora, testified that "Bruce and Bruce . . . made all determinations of the benefits to be paid to participants of the withdrawing employers." S.A. Vora Aff. (Jan. 17, 1996) at ¶ 21, reprinted in Appellants' App. at 68. More importantly, Vora testified that "[p]ayment or provision for payment of those benefits as determined by Bruce and Bruce [was] made for all participants in the Plan." Id. at ¶ 22, reprinted in Appellants' App. at 68.

In addition, Vora testified regarding the distribution of Plan assets attributable to specific employers. Vora testified that, after Midwest Plating withdrew, "there were no assets remaining in the Plan attributable to Midwest Plating." Id. at ¶ 5, reprinted in Appellants' App. at 66. Vora further testified that, when Steel Technologies withdrew, "Steel Technologies elected not to receive any portion of the Pension Fund," even though there were assets remaining that were attributable to Steel Technologies. Id. at ¶ 10, reprinted in Appellants' App. at 67. Instead, Steel Technologies desired to allocate those remaining assets to its employees. Id. at ¶ 7, reprinted in Appellants' App. at 66. Finally, Vora testified that Edgerton, North Vernon Forge, and North Vernon Steel did not elect, as provided by the Plan, to forego receipt of any amounts from the Plan. Id. at ¶¶ 16, 18, 20, reprinted in Appellants' App. at 67-68. Therefore, in accordance with the provisions of the Plan, these employers are still eligible to receive a distribution of the residual assets attributable to them. See Plan Amendment § D, reprinted in Appellants' App. at 47.

The senior vice president and actuary of Hawkeye, Edward Cowman, also testified regarding the termination of the Plan. Cowman, like Vora, testified that Bruce & Bruce "made determinations of which assets should be allocated and segregated for the benefit of participants of each employer when that employer withdrew from the Plan." Edward Cowman Aff. (Dec. 21, 1995) at ¶ 3, reprinted in Appellants' App. at 2. In addition, Cowman, like Vora, testified that Hawkeye "has paid, or made provision for payment of, participant benefits and appropriate administrative expenses upon [P]lan termination." Id. at ¶ 7, reprinted in Appellants' App. at 2. Finally,

according to Cowman, "[t]he Plan continues to hold residual assets with a value of $293,340.00 as of September 30, 1995." Id. at ¶ 8, reprinted in Appellants' App. at 3. It is these assets that gave rise to the instant dispute.

On January 17, 1995, Hawkeye filed its action for declaratory relief in the district court and then later amended its complaint on February 8, 1996. In its amended complaint, Hawkeye requested a declaratory judgment that: (1) "the Plan has been terminated and that benefits for all Plan participants have been properly paid or provided for;" (2) "all Plan assets remaining after payment of, or provision for, all benefits to participants and appropriate administrative expenses, shall be distributed to Avis and Edgerton Forge pursuant to the terms of the Plan;" (3) "Avis, Edgerton Forge, or such other recipient of the residual assets of the Plan as the Court may determine, shall indemnify and hold Plaintiff harmless from any claim to those assets asserted on behalf of Plan participants;" and (4) "the costs and expenses incurred by the Plaintiff as Plan Administrator and for prosecuting this action and obtaining this declaratory judgment are properly deducted from those residual Plan assets as appropriate administrative expenses under the terms of the Plan . . . ." Amend. Compl. (Feb. 8, 1996) at 9.

In October 1995, the Union submitted a set of interrogatories to Hawkeye, requesting information regarding how employer contributions were determined, how retirement benefits were calculated, and how Plan assets came to exceed Plan liabilities. In response to these

interrogatories, Hawkeye sought to defer its obligation to answer the interrogatories. Hawkeye first submitted a motion for an extension of time that was granted by the magistrate judge handling this action. Hawkeye then submitted a motion for a protective order to the magistrate judge; this motion was also granted. As a result of the magistrate judge's decisions, Hawkeye was not obligated to respond to the Union's interrogatories until April 1, 1996.

On January 19, 1996, prior to responding to the Union's interrogatories, Hawkeye filed a motion for summary judgment. On February 9, 1996, AVIS and Edgerton subsequently joined in Hawkeye's motion for summary judgment. On February 12, 1996, the Union submitted a motion to defer judgment on Hawkeye's motion for summary judgment, arguing that Hawkeye must respond to the Union's interrogatories before Hawkeye's summary judgment motion could be heard. On March 8, 1996, the magistrate judge denied the Union's motion, holding that the Union "[had] not established good cause to require the discovery sought prior to ruling on the motion for summary judgment." Order (Mar. 8, 1996) at ¶ 4. In response to the magistrate judge's ruling, the Union filed a motion in district court to vacate the magistrate judge's order. On April 10, 1996, the district court denied the Union's motion. Order (Apr. 10, 1996) at 1.

On March 26, 1996, the Union filed an opposition brief to Hawkeye's summary judgment motion as well as a cross motion for summary judgment. On June 14, 1996, the district court granted the Union's cross motion for summary judgment and denied Hawkeye's motion for summary judgment. Mem. Op. (June 14, 1996) at 19.

The district court held that Hawkeye's interpretation of the Plan as allowing for the distribution of residual assets to AVIS and Edgerton contravened 29 U.S.C. § 1103(c)(1) and therefore that Hawkeye's interpretation of the Plan constituted an abuse of discretion. Mem. Op. at 18-19. In support of its holding, the district court reasoned that § 1103(c)(1) provides generally that assets of a plan cannot be distributed to employers but must be

held for the exclusive benefit of plan participants. Mem. Op. at 16-17. In addition, the district court rejected Hawkeye's argument that 29 U.S.C. § 1344(d)(1) (1994) provided an exception to § 1103(c)(1) under which assets could be distributed to AVIS and Edgerton. Mem. Op. at 17-18. The district court explained that:

> Section 1344(d)(1) provides for the distribution
> of residual assets of a single-employer plan.
> 29 U.S.C. § 1344. However, in the present case,
> it is undisputed that the Plan is a multi-
> employer plan. As such, the exception to
> Section 1103[(c)(1)] provided in Section
> 1344(d)(1) does not apply.

Mem. Op. at 17-18 (note omitted). Accordingly, the district court granted the Union's motion for summary judgment, ruling that the Plan's remaining assets must be distributed to Plan participants. Id. at 19.

The district court subsequently entered an order providing for the distribution of the Plan's residual assets to Plan participants. Specifically, the district court ordered that:

1. Residual assets in the Plan shall be distributed to Participants who were employees of North Vernon Forge, Inc., Edgerton Forge, Inc. and North Vernon Steel Products, Inc. at the times of their respective withdrawals from participation in the Plan.

2. The Actuary should apply the provisions of Section 12.6 of the Plan, as amended, as if the employers had elected not to receive the assets remaining after payment or provision for payment of the defined benefits, such that the residual assets attributable to each of North Vernon Forge, Inc., Edgerton Forge, Inc. and North Vernon Steel Products, Inc. determined as stated in paragraph 12.2 will be allocated among the Participants of each such Participating Employer as

- 17 -

of the date of determination of the residual assets based upon the present value of the accrued benefit of each such Participating Employer's Participants determined on the revised benefit formula if the formula of computing benefits, as of the date of such determination, is not discriminatory.

> 3. Any residual assets allocated to
> Participants who cannot be located
> should be escheated under applicable
> state unclaimed property laws.

Consent Order Amending Judgement (July 23, 1996) at 2 (emphasis in original).

On July 1, 1996, the Union filed a motion for attorney's fees. The district court denied the Union's motion for attorney's fees on September 4, 1996.

AVIS and Edgerton now appeal the district court's grant of summary judgment to the Union and the district court's denial of Hawkeye's motion for summary judgment. The Union brings a protective cross-appeal and appeals the denial of attorney's fees.

**II.**

On appeal, we review de novo the district court's grant of summary judgment to the Union. See McCormack v. Citibank, N.A., 100 F.3d 532, 537 (8th Cir. 1996). Summary judgment is proper only if the record, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(c). Furthermore, where an appeal from an order denying the appellant's motion for summary judgment is raised together with an appeal from an order granting the appellee's cross motion for summary judgment, we may enter an order directing that summary judgment be granted in favor of the appellant if the record presents no genuine issue of material fact and the

- 19 -

appellant is entitled to judgment as a matter of law. Mohahan v. County of Chesterfield, Virginia, 95 F.3d 1263, 1265 (4th Cir. 1996); see Talley v. United States Postal Serv., 720 F.2d 505, 508 (8th Cir. 1983) ("The appellate court may decide an issue without remand . . . when the facts with respect to a particular issue are undisputed.").

Because the Plan gives Hawkeye discretionary authority to interpret the Plan, we review Hawkeye's interpretation of Plan provisions for abuse of discretion.  See Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1344 (8th Cir. 1997); Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 640-41 (8th Cir. 1997); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under the abuse of discretion standard, we may not invalidate Hawkeye's interpretation of the Plan unless its interpretation is unreasonable.  Hutchins, 110 F.3d at 1344.  "An interpretation is reasonable if a reasonable person could have reached a similar decision, given the evidence before him."  Id. (quotations and citation omitted)(emphasis in original).

In order to determine whether a plan administrator's interpretation of a plan is reasonable, this Court considers:

> 1) whether the interpretation is consistent with the goals of the plan; 2) whether the interpretation renders any language in the plan meaningless or makes the plan internally inconsistent; 3) whether the interpretation conflicts with ERISA; 4) whether the interpretation has been consistent; and 5) whether the interpretation is contrary to the clear language of the plan.

Id.

In the instant case, Hawkeye has concluded that the Plan calls for the distribution of the Plan's remaining assets to AVIS and Edgerton.  The district court,

however, found that Hawkeye's interpretation contravenes 29 U.S.C. § 1103(c)(1) and is therefore unreasonable. See Mem. Op. at 18.

Section 1103(c)(1), which is also known as the anti-inurement or exclusive benefit rule, provides generally that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of

administering the plan." 29 U.S.C. § 1103(c)(1). Because § 1103(c)(1) widely proscribes the distribution of plan assets to employers, the district court denied Hawkeye's summary judgment motion. See Mem. Op. at 18-19. The district court instead granted the Union's motion for summary judgment, ruling that, pursuant to § 1103(c)(1), the Plan's remaining assets must go to Plan participants. See Mem. Op. at 18-19. The central question raised by AVIS and Edgerton on appeal is therefore whether Hawkeye can, consistently with the terms of the plan as well as the law, distribute the Plan's remaining assets to one or more Plan employers.

On appeal, AVIS and Edgerton argue that: (1) the Plan's remaining assets are not assets of the Plan and therefore distribution of the residual assets to one or more Plan employers is not barred by § 1103(c)(1); and (2) although the Plan started as a multiemployer plan, it was a single-employer plan upon termination and consequently distribution of the residual assets to one or more Plan employers fits within the exception to § 1103(c)(1) provided by 29 U.S.C. § 1344(d)(1). AVIS and Edgerton therefore argue that the district court's grant of summary judgment to the Union should be reversed because the district court's conclusion that § 1103(c)(1) bars distribution of the Plan's remaining assets to one or more Plan employers is erroneous. AVIS and Edgerton further argue that this Court should direct the district court to enter an order granting Hawkeye's motion for summary judgment.

We agree with AVIS's and Edgerton's argument in part and hold that the district court erred in granting the

Union's motion for summary judgment.  However, we reject AVIS's and Edgerton's invitation to direct the district court to enter an order granting Hawkeye's motion for summary judgment.

## A.

AVIS and Edgerton first assert that § 1103(c)(1) expressly prohibits only "assets of a plan" from inuring to the benefit of an employer.  29 U.S.C. § 1103(c)(1).

Drawing on this assertion, AVIS and Edgerton argue that the Plan's remaining assets are not "assets of a plan" within the meaning of § 1103(c)(1).  Thus, according to AVIS and Edgerton, because § 1103(c)(1) prohibits only assets of a plan from inuring to the benefit of employers and because the Plan's remaining assets are not assets of a plan, § 1103(c)(1) does not bar Hawkeye from distributing the Plan's remaining assets to one or more Plan employers.  We reject this argument because we conclude that the Plan's remaining assets are assets of a Plan within the meaning of § 1103(c)(1).

To address AVIS's and Edgerton's argument, we must first recognize that, when the employers funded the Plan, their contributions became assets of the Plan. See Plan § 7.5, reprinted in Appellants' App. at 35 ("All contributions made by the Employer under this Plan shall be paid to, and deposited in, the Pension Fund.").  We must also recognize that the Plan's remaining assets--the assets to which AVIS and Edgerton lay claim--are merely the assets left in the Plan after Hawkeye paid or provided for Plan liabilities.  As such, the Plan's remaining assets are residual assets of the Plan, and the source of these residual assets is the Plan assets.

Although ERISA does not explicitly define residual assets as "assets of a plan" for purposes of § 1103(c)(1), Congress has impliedly recognized in 29 U.S.C. § 1344 that residual assets constitute a subset of assets of a plan.  As a subset of plan assets, residual assets are therefore assets of a plan within the meaning of both § 1344 and § 1103(c)(1).  See Gozlon-Peretz v. United States, 498 U.S. 395, 407-08 (1991) ("It is not

uncommon to refer to other, related legislative enactments when interpreting specialized statutory terms," since Congress is presumed to have "legislated with reference to" those terms.).

The only time that the term "residual assets" appears in ERISA is in § 1344, a provision dealing with the termination of single-employer plans. Section 1344 first provides that, "[i]n the case of the termination of a single-employer plan, the plan administrator <u>shall</u> allocate the assets of the plan (available to provide benefits) among

the participants and beneficiaries" in a statutorily-mandated order of priority. 29 U.S.C. § 1344(a) (1994) (emphasis added). Section 1344(d)(1) then provides that, subject to certain limitations, "any <u>residual assets</u> of a single-employer plan <u>may</u> be distributed to the employer . . . ." 29 U.S.C. § 1344(d)(1) (emphasis added).

By requiring that plan assets be used to pay plan liabilities before any residual assets can be distributed to an employer, § 1344's framework for the distribution of plan assets suggests that Congress understood residual assets to be, as the term implies, any assets of a plan remaining after the plan's liabilities have been satisfied. Plan assets must first be used to pay plan liabilities, and only then can the plan assets remaining--the residual assets--be distributed to the employer. Thus, because the assets of a plan are the source of residual assets, Congress has impliedly recognized in § 1344 that residual assets are merely a subset of assets of a plan and that residual assets are therefore a form of plan assets. <u>Cf.</u> 29 C.F.R. § 4041.2 (1996) (defining residual assets, for purposes of single-employer plan terminations, to mean "the <u>plan assets</u> remaining after all benefit liabilities and other liabilities of the plan have been satisfied" (emphasis added)). Therefore, the anti-inurement rule of § 1103(c)(1), which prohibits assets of a plan from inuring to the benefit of employers, also prevents residual assets of a plan from inuring to the benefit of an employer.

**B.**

- 27 -

AVIS and Edgerton next argue that distribution of residual Plan assets to one or more Plan employers fits within the exception to § 1103(c)(1) found in 29 U.S.C. § 1344(d)(1).  We agree in part and hold that the portion of any residual Plan assets attributable to North Vernon Steel may be distributed to North Vernon Steel or its successor in interest.

Section 1344(d)(1) provides a limited exception to the anti-inurement rule of § 1103(c)(1). Specifically, § 1344(d)(1) provides that, with the exception of a plan's residual assets that come from employee contributions,

> any residual assets of a single-employer plan may be distributed to the employer if--
>
>> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
>>
>> (B) the distribution does not contravene any provision of law, and
>>
>> (C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d)(1).

The district court found that, because the Plan was a multiemployer plan and because § 1344(d)(1) expressly applies only to single-employer plans, the Plan's residual assets could not be distributed to AVIS and Edgerton pursuant to § 1344(d)(1). Mem. Op. at 17-18. On appeal, AVIS and Edgerton counter that, although the Plan was formed as a multiemployer plan, the Plan was a single-employer plan when it terminated. AVIS and Edgerton point out that, for the sixteen months prior to the termination of the Plan, North Vernon Steel was the only employer in the Plan. As a result, according to AVIS and Edgerton, the district court erred in concluding that the Plan was a multiemployer plan upon termination

and erred in concluding that the exception to the anti-inurement rule found in § 1344(d)(1) did not apply.

For purposes of ERISA plan terminations, a plan is either a multiemployer plan or a single-employer plan. A multiemployer plan is defined as a plan:

(A) to which more than one employer is required to contribute,

(B) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

(C) which satisfies such other requirements as the Secretary of Labor may prescribe by regulation,[4]

except that, in applying this paragraph--

(i) a plan shall be considered a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding such termination, and

(ii) for any plan year which began before September 26, 1980, the term "multiemployer plan" means a plan described in section 414(f) of title 26 as in effect immediately before such date . . . .

29 U.S.C. § 1301(a)(3) (1994). By contrast, a single-employer plan is any defined-benefit plan that is not a multiemployer plan. See 29 U.S.C. § 1301(a)(15) (1994).

Upon termination and for the sixteen-month period preceding termination, the Plan did not meet the requirements of either § 1301(a)(3)(A) or § 1301(a)(3)(B)--the two essential elements of a multiemployer plan.[5] Because only North Vernon Steel was

---

[4]The Secretary of Labor has not prescribed any further requirements for a plan to be defined as a multiemployer plan. See 29 C.F.R. § 4001.2 (1996).

[5]Indeed, these two requirements, § 1301(a)(3)(A) and § 1301(a)(3)(B), constitute the only elements that distinguish a multiemployer plan from a single-employer plan

required to contribute to the Plan upon termination and for the sixteen-month period preceding termination, the Plan did not meet § 1301(a)(3)(A)'s requirement that more

---

because the Secretary of Labor has not prescribed any further requirements pursuant to the powers granted in § 1301(a)(3)(C). See 29 C.F.R. § 4001.2.

than one employer be required to contribute. In addition, during this same period, the Plan was maintained pursuant to a collective bargaining agreement with only one employer. Consequently, the Plan did not meet § 1301(a)(3)(B)'s requirement that the governing collective bargaining agreement be formed with "more than one employer . . . ." 29 U.S.C. § 1301(a)(3)(B).

Furthermore, § 1301(a)(3)(C) does not dictate that the Plan was a multiemployer plan on and after termination. Under § 1301(a)(3)(C)(i), "a plan shall be considered a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding such termination . . . ." 29 U.S.C. § 1301(a)(3)(C)(i). In the instant case, the Plan's official plan year ran from January 1 through December 31. See Plan § 2.29, reprinted in Appellants' App. at 14. During the entire 1989 plan year, the Plan did not meet the requirements of either § 1301(a)(3)(A) or § 1301(a)(3)(B). In addition, the Plan did not meet the requirements of either § 1301(a)(3)(A) or § 1301(a)(3)(B) for four of the twelve months of the 1988 plan year. Consequently, when the Plan terminated on December 31, 1989, the Plan had not been a multiemployer plan for the plan year preceding termination. The Plan had not been a multiemployer plan for any portion of the 1989 year, and it had only been a multiemployer plan for eight months of the 1988 plan year, but not for the 1988 plan year. For this reason, § 1301(a)(3)(C)(i) does not dictate that the Plan was a multiemployer plan on and after termination. In addition, since a plan year beginning before September

- 33 -

26, 1980 is not at issue in the present action, § 1301(a)(3)(C)(ii) is not applicable.

Because the Plan did not meet either of the two requisites of a multiemployer plan for the sixteen months prior to termination and because neither § 1301(a)(3)(C)(i) nor § 1301(a)(3)(C)(ii) dictate that the Plan is to be considered a multiemployer plan, the Plan could not have been and therefore was not a multiemployer plan when it

terminated.  As a result, because any defined benefit plan[6] that is not a multiemployer plan is by definition a single-employer plan, see 29 U.S.C. § 1301(a)(15), the Plan was a single-employer plan when it terminated. Thus, although the Plan was formed as a multiemployer plan, the Plan converted to a single-employer plan. Cf. 29 U.S.C. § 1412 (1994) (allowing for the transfer of assets and liabilities from a multiemployer to a single-

---

[6]The Union argues that the Plan was not a defined benefit plan, but rather a defined contribution plan.  We reject this argument as meritless.

In general, an ERISA plan can either be a defined contribution plan or a defined benefit plan.  Under 29 U.S.C. § 1002(34), a defined contribution plan is defined as

> a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34) (1994).  Conversely, a defined benefit plan is generally defined as any pension plan that is not a defined contribution plan.  See 29 U.S.C. § 1002(35) (1994).  Thus, individual accounts for each participant and benefits based solely upon such accounts distinguish defined contribution plans from defined benefit plans.

In the instant case, the Plan does not provide for "an individual account for each participant . . . ." 29 U.S.C. § 1002(34).  Moreover, Plan benefits are not "based solely upon the amount contributed to the participant's account . . . ." Id.  Instead, the Plan was entirely funded by employers, and Plan benefits were calculated by multiplying a participant's years of service by a monthly pension rate set forth in the collective bargaining agreement reached between Plan employers and the Union.  See Plan §§ 2.1, 2.22, 5.1, reprinted in Appellants' App. at 10, 13, 21.  Because the Plan has neither of the requisite features of a defined contribution plan, the Plan is not a defined contribution plan but is instead a defined benefit plan.  Accordingly, we reject the Union's argument to the contrary.

- 35 -

employer plan); 29 U.S.C. § 1413 (1994) (allowing for the partitioning of a multiemployer plan).

We can find no provision of ERISA that would prevent a plan from converting from a multiemployer to a single-employer plan in this way.  Instead, § 1301(a)(3)(C)(i) impliedly recognizes that a plan that starts as a multiemployer plan may become a single-employer plan by the time of its termination.  See 29 U.S.C. § 1301(a)(3)(C)(i) ("[A] plan shall be considered a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding such termination . . . .").  Moreover, § 12.2 and § 12.3 of the Plan expressly provide for the sequenced withdrawal of employers that resulted in the conversion of the Plan from a multiemployer to a single-employer plan.  See Ryan v. Federal Express Corp., 78 F.3d 123, 127 (3d Cir. 1996) (noting that "[t]he Supreme Court has emphasized the primacy of plan provisions absent a conflict with the statutory policies of ERISA" (quotations and citations omitted)); cf. Bollman Hat Co. v. Root, 112 F.3d 113, 118 (3d Cir. 1997) ("[T]he policies underlying ERISA generally counsel reliance on unambiguous plan language.").  Accordingly, we agree with AVIS and Edgerton that the district court erred in holding that the Plan was a multiemployer plan upon termination and in holding that the exception to the anti-inurement rule found in § 1344(d)(1) did not apply for that reason.

Although we agree with AVIS and Edgerton that the Plan was a single-employer plan upon termination, we still must consider each of the remaining requirements of § 1344(d)(1).  For a distribution of assets to be excepted from the anti-inurement rule of § 1103(c)(1), § 1344(d)(1) also requires that: (1) the assets to be

distributed must be residual assets, <u>see</u> 29 U.S.C. § 1344(d)(1); (2) the residual assets must not come from employee contributions, <u>see</u> 29 U.S.C. § 1344(d)(1),(3); (3) the distribution of residual assets to any one or more employer must "not contravene any provision of law," 29 U.S.C. § 1344(d)(1)(B); and (4) "the plan provides for such a distribution . . . ." 29 U.S.C. § 1344(d)(1)(C).

The record before us, viewed in the light most favorable to AVIS and Edgerton, indicates that all Plan liabilities have been paid or provided for and that only residual

assets remain.  In addition, it is undisputed that none of the residual assets of the Plan came from employee contributions.  The Union argues, however, that the distribution of residual assets to one or more Plan employers meets neither § 1344(d)(1)(B)'s requirement that the distribution not contravene a provision of law nor § 1344(d)(1)(C)'s requirement that the Plan provides for such distribution.

1. Contravention of Law

In its cross-appeal, the Union argues that 29 U.S.C. § 186(c) (1994) prohibits plan administrators from distributing a plan's residual assets to employers. Hence, the Union concludes that distribution of residual Plan assets to one or more Plan employers would contravene § 186(c) as well as § 1344(d)(1)(B).

To understand § 186(c), we must first consider 29 U.S.C. § 186(a) (1994).  Section 186(a) widely proscribes the transfer of money or other items of value from employers to labor organizations, see 29 U.S.C. § 186(a), and § 186(c) provides certain exceptions to the general proscription found in § 186(a).  In particular, as relevant here, § 186(c) provides that:

> The provisions of [§ 186] shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such [labor union] representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . . Provided, [t]hat . . . such payments are held in trust for

- 39 -

the purpose of paying . . . for the benefit of employees, their families and dependents, for . . . pensions on retirement or death of employees . . . and . . . such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities . . . .

29 U.S.C. § 186(c) (emphasis in original).

The Union seizes on the last phrase of the excerpted portion of § 186(c) to argue that residual assets of the Plan cannot be distributed to one or more Plan employers. The Union argues that, because "the funds held [in a pension plan] cannot be used for <u>any purpose other than paying such pensions or annuities</u>," 29 U.S.C. § 186(c)(5) (emphasis added), the Plan's residual assets must be distributed to Plan participants.

Section 186(c)(5), however, was never intended to prohibit a plan administrator from distributing residual plan assets to an employer. Instead, § 186(a) and § 186(c) serve an entirely different purpose. Congress carefully crafted § 186(a) and § 186(c) to allow employers to contribute to pension plans yet, at the same time, prevent employers from unduly influencing labor organizations or their representatives. Congress wanted to insure that employers did not exert undue influence on labor unions by using plan assets to bribe labor representatives or by funneling money to labor organizations through pension plans. <u>See</u> <u>Toyota Landscaping Co. v. Southern Cal. Dist. Council of Laborers</u>, 11 F.3d 114, 117-18 (9th Cir. 1993); <u>Roark v. Boyle</u>, 439 F.2d 497, 501 (D.C. Cir. 1970).

In the instant case, Hawkeye does not intend to transfer assets to a labor organization or its representatives but instead intends merely to distribute residual Plan assets to one or more Plan employers. Such a transfer in no way raises the concern that § 186 was designed to address--the potential that an employer will use pension funds to unduly influence labor organizations. For this reason, we hold that § 186(c)(5)

does not apply to Hawkeye's intended distribution of residual assets to one or more Plan employers. Accordingly, we reject the Union's argument that distribution of the Plan's residual assets to one or more Plan employers violates § 186(c) as well as § 1344(d)(1)(B).

## 2. Terms of the Plan

The Union argues that, even if the distribution of residual Plan assets to one or more Plan employers does not contravene a provision of law, the terms of the Plan prohibit such a distribution. Hence, under the Union's argument, distribution of residual Plan assets to one or more Plan employers would contravene § 1344(d)(1)(C)'s requirement that the Plan provide for such a distribution.

More specifically, the Union argues that distribution of residual Plan assets to one or more Plan employers would contravene § 12.6(a) of the Plan. Section 12.6(a) provides that "[t]he Employer shall receive such amounts, if any, as may remain after the satisfaction of all liabilities of the Plan and arising out of any variations between actual requirements and expected actuarial requirements . . . ." Plan § 12.6(a), reprinted in Appellants' App. at 44. According to the Union, there could be no variation between actual requirements and expected actuarial requirements because actuarial calculations were not performed under the Plan.

We reject the Union's argument because, viewed in the light most favorable to AVIS and Edgerton, the record indicates that actuarial calculations were performed under the Plan. Although the Plan required the employers to finance the Plan at the levels set forth in the collective bargaining agreement that each employer reached with Union representatives, see Plan § 7.6, reprinted in Appellants' App. at 36, the Plan also provided that these levels were to be determined at least

in part by the actuarial calculations of the Plan actuary, Bruce & Bruce.  <u>See</u> Plan § 7.2, <u>reprinted in</u> Appellants' App. at 35.  The Union has offered no evidence indicating that these calculations were not performed.

Moreover, the Plan provided that the Plan's actual requirements were calculated independently of expected actuarial requirements.  Actual requirements were calculated by multiplying each participant's years of service by the monthly pension rate set forth

in the collective bargaining agreement that applied to that participant. In contrast, the actuarial calculations that Bruce & Bruce was obligated to perform required Bruce & Bruce to estimate the future needs of the Plan. As a result, under the Plan, expected actuarial requirements would almost inevitably vary from actual requirements. Thus, we conclude that § 12.6 of the Plan provides for the distribution of residual assets to a Plan employer.

Although we have addressed all of the arguments raised by the parties with respect to the Union's motion for summary judgment, at least one issue remains. Neither § 1344(d)(1) nor § 12.6 of the Plan provide for the distribution of residual assets to multiple employers, as Hawkeye seeks to do. Instead, each provision calls for the distribution of residual assets to "the employer." For this reason, we hold that residual Plan assets may be distributed to either North Vernon Steel, the last employer to withdraw from the Plan, or North Vernon Steel's successor in interest, but not to any other Plan employer. We also hold that Hawkeye may only distribute to North Vernon Steel or its successor in interest those residual Plan assets that are

attributable to North Vernon Steel.[7]  Any Plan assets
remaining after such distribution shall inure to the

---

[7]We note that our result is not inconsistent with the primary purpose of ERISA: "'the protection of individual pension rights . . . .'" Roth v. Sawyer-Cleator Lumber Co., 61 F.3d 599, 602 (8th Cir. 1995) (quoting H.R. Rep. No. 93-533, at 1 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4639).

Several courts have recognized that a per se rule awarding residual or surplus assets to plan participants and beneficiaries does not necessarily promote ERISA's goals.  These courts have recognized that awarding residual assets to participants and beneficiaries may undermine the financial stability of pension plans by penalizing employers for overfunding plans and thereby providing an incentive for employers to underfund plans so as to avoid losing residual assets upon termination of the plan.  In addition, these courts have recognized that a per se rule awarding residual assets to participants may provide participants with a benefit for which they have not bargained. See, e.g., Borst v. Chevron Corp., 36 F.3d 1308, 1322 (5th Cir. 1994), cert. denied 115 S. Ct. 1699 (1995); Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1190 (7th Cir. 1994); Chait v. Bernstein, 835 F.2d 1017, 1027 (3d Cir. 1987); Financial Insts. Retirement Fund v. Office of Thrift Supervision, 766 F. Supp. 1302, 1308 (S.D.N.Y. 1991), aff'd by 964 F.2d 142 (2d Cir. 1992).

In the instant case, distribution of the residual assets to the Plan's participants would, in contravention of ERISA's underlying goals, provide the participants with an undeserved windfall and penalize the employers for conscientiously funding the Plan.

benefit of the Plan's participants pursuant to §
1103(c)(1).

## III.

For the foregoing reasons, we reverse the district court's grant of summary judgment to the Union. Furthermore, given that no information appears in the record that would allow us to conclude what portion, if any, of the remaining assets are residual assets attributable to North Vernon, at least one genuine issue of material fact remains with respect to Hawkeye's motion for summary judgment. Accordingly, we affirm the district court's denial of Hawkeye's motion for summary judgment. Finally,
we remand this case to the district court for further proceedings in accordance with this opinion.[8]

---

[8]In its cross-appeal, the Union argues that the district court erred in denying its motion for attorney's fees. Because we conclude that the Union is not entitled to summary judgment, we also hold that the district court did not err in denying the Union's motion for an award of attorney's fees.

The Union also argues in its cross-appeal that the district court erred in denying the Union's motion to vacate the magistrate judge's March 8, 1996 order. According to the Union, the district court erred because the magistrate judge should have granted the Union's motion to defer Hawkeye's motion for summary judgment. The Union argues that the magistrate judge should have deferred a ruling on summary judgment until Hawkeye responded to the interrogatories submitted by the Union. Because we conclude that summary judgment was not properly granted and because the protective order allowing Hawkeye to avoid answering the Union's interrogatories has since expired, the Union's argument is moot. Accordingly, we decline to address this issue.

A true copy.

   Attest:


      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.