# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-1175

———————

Barry J. Jewell,                *
                                        *
          Plaintiff – Appellee,     *
                                        *   Appeal from the United States
    v.                             *   District Court for the
                                        *   Eastern District of Arkansas.
United States of America,    *
                                        *
          Defendant – Appellant.   *

———————

Submitted: September 26, 2008
Filed: December 10, 2008

———————

Before RILEY, BRIGHT, and MELLOY, Circuit Judges.

———————

BRIGHT, Circuit Judge.

This appeal stems from a civil action brought by appellee Barry J. Jewell against appellant the United States ("the IRS") seeking a refund of his pro rata share of a tax sanction paid in conjunction with a closing agreement between his former law firm and the IRS. On appeal, the IRS challenges the decisions of the district court (1) denying the IRS's motion to dismiss the complaint for lack of standing and (2) granting Jewell summary judgment on his claim that the IRS procured a closing agreement with Jewell by fraud or malfeasance. The IRS argues that Jewell lacked standing to challenge the closing agreement because the agreement was entered with Jewell's law firm, and, even if Jewell had standing, the district court improperly

concluded that the undisputed facts showed that the IRS had used fraud or malfeasance in procuring the agreement. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I. BACKGROUND

Jewell was a shareholder in the law firm of Jewell, Moser, Fletcher & Holleman, P.A. ("JMFH"). JMFH sponsored four prototype retirement plans, which its clients, mostly small businesses, relied upon to create individual retirement plans. As the plans' sponsor, JMFH had an obligation to ensure that (1) its prototype plans complied with federal law and (2) its clients amended their individual plans to comply with changes in federal law. *See* Rev. Proc. 2000-20, § 3.07.

After Congress passed a series of laws that affected the retirement plans, the IRS required a sponsor to ensure that individual client plans were amended in accordance with the new laws by February 28, 2002, or the last day of the first plan-year beginning on or after January 1, 2001, whichever was later. *See* Rev. Proc. 2001-55. But if a sponsor submitted an amended *prototype* plan for IRS approval by December 31, 2000, the IRS extended the deadline for amendments made to *individual* plans to the later of September 30, 2003 or the last day of the twelfth month after the date on which the IRS approved the prototype plan. *See* Rev. Proc. 2000-20 § 19.07.

JMFH submitted its four amended prototype plans to the IRS on February 5, 2002. Because JMFH failed to submit the prototype plans by December 31, 2000, the individual plans that relied on the prototype plans were not able to receive the extension. *Id.* As a result, JMFH had to ensure that its four prototype plans *and* all of its clients' individual plans complied with the new federal laws by, as relevant here, February 28, 2002. But during the summer and fall of 2002, the IRS requested that JMFH make several changes to its plans to bring them in compliance with the changes

in federal law. Thus, these individual plans, the IRS argued, were untimely and potentially subject to disqualification or other penalties.

Meanwhile, in July 2002, one of JMFH's shareholders (Scott Fletcher) left the firm. The remaining shareholders (JMFH's president Keith Moser, John Holleman, and Jewell) redeemed Fletcher's interest in the firm and continued to practice together until the end of August 2002. In a September 2002 letter, Jewell informed the IRS that JMFH "will stay in existence under my control" and will continue to act as the sponsor of the prototype retirement plans.

In May 2003, the IRS determined that more than sixty of the individual plans sponsored by JMFH were not timely amended to comply with changes in federal law. The IRS proposed that JMFH enter into an umbrella closing agreement, in which it would deem the plans timely amended and JMFH would pay a penalty. Jewell, although signaling his willingness to enter into a closing agreement, disputed the nature of the plans' deficiencies in a series of letters sent in the summer of 2003. For its part, the IRS indicated that JMFH had two options: (1) negotiate an umbrella closing agreement with the IRS to resolve all of the deficiencies or (2) decline to do so, which would result in the IRS's review of each plan—a contingency that would likely result in plan disqualification or additional penalties. Negotiations between the IRS and Jewell (as a representative of JMFH) continued through the summer and fall of 2003.

In June 2003, Jewell sought judicial dissolution of JMFH in Arkansas state court and an accounting of the firm's receivables.[1] In December 2003, Moser, JMFH's president, sent the IRS a signed Form 2848 Power of Attorney and Declaration of Representative, which authorized only Moser and Fletcher to represent

---

[1]In September 2004, the state court ordered the dissolution but deferred its decision as to the effective date. In December 2005, the state court ruled that the effective date of the dissolution was July 25, 2002.

-3-

JMFH before the IRS. In a letter that accompanied the Power of Attorney, Moser stated that JMFH had not yet been dissolved, that Jewell was not authorized to represent the firm, and that the firm would continue to sponsor the plans.

Later that month, Moser and Fletcher agreed that JMFH would pay $26,800—almost one third of the IRS's initial settlement offer—to settle with the IRS. In return, the IRS would determine that the plans were timely amended. The closing agreement contains a finality provision in accordance with 26 U.S.C. § 7121, which provides that the agreement is "final and conclusive" except that "the matter . . . may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact." Moser and Fletcher signed the closing agreement and returned the closing agreement to the IRS. Jewell did not sign the agreement. Moser, Fletcher, and Jewell divided the sanction equally, bundled three checks made out to the IRS, and sent the checks to the IRS.

After unsuccessfully filing a claim for a refund with the IRS, Jewell filed this action in June 2006 against the IRS, seeking a refund of $8,933.33, his pro rata share of JMFH's payment under the closing agreement. Jewell argued that the IRS had obtained the closing agreement through fraud, malfeasance, or misrepresentation of fact. The IRS moved to dismiss on the ground that Jewell lacked standing. The district court denied the motion, holding that because JMFH had stopped operating and Jewell had paid the sanction out of personal funds, Jewell had incurred direct harm and thus had standing to sue.

After the parties cross-moved for summary judgment, the district court granted Jewell's motion and denied the Government's motion. The district court held that the IRS's tactics in procuring the closing agreement qualified as "fraud or malfeasance" and therefore justified setting the agreement aside. Specifically, the district court concluded that the IRS presented JMFH with a "Hobson's choice" in that the IRS demanded that JMFH "either accept the closing agreement and pay a penalty or

subject its clients to individual plan evaluations as 'late amenders,' submitting them to the harsh consequences of disqualification, penalty, or both." The district court also held that the deficiencies in the plans were either insignificant or should have been excused because of Jewell's good faith attempts to comply with the spirit of the changes to federal law, and ordered judgment to Jewell in the amount of $8,933.33 plus interest. This appeal follows.

## II. DISCUSSION

The IRS contends that the district court improperly concluded that Jewell had standing to challenge the propriety of the IRS's closing agreement with JMFH. We review the district court's conclusion that a plaintiff has standing de novo. *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 484 (8th Cir. 2006).

A plaintiff must establish subject matter jurisdiction, for which standing is a prerequisite. *See Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006). "Standing includes both a constitutional and a prudential component." *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006). The "irreducible constitutional minimum of standing" consists of three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a party must have suffered an "injury in fact," an actual or imminent concrete and particularized invasion to a legally protected interest; second, the injury must be fairly traceable to the challenged action of the defendant; and third, the injury must be redressable by a favorable decision. *Id.*; *Gale*, 470 F.3d at 1265.

"Even if a plaintiff meets the minimal constitutional requirements for standing, there are prudential limits on a court's exercise of jurisdiction." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1378 (8th Cir. 1997). One such prudential limitation is the requirement that "a litigant must assert his or her own

legal rights and interest, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

Here, the IRS argues that "[b]ecause JMFH is the entity from which the IRS collected the sanction, it is the only proper entity to bring suit seeking to set aside the closing agreement and to recover the payment." As a result, Jewell does not have standing because he has not satisfied the prudential standing requirement that a litigant may generally assert only his own rights. We find this argument to be persuasive.

This court has stated that "[s]tanding to sue [for a tax refund] extends only to the taxpayer from whom the tax was allegedly wrongfully collected." *Murray v. United States*, 686 F.2d 1320, 1325 n.8 (8th Cir. 1982); *cf. Collins v. United States*, 532 F.2d 1344, 1347 n.2 (Ct. Cl. 1976) ("In order to maintain an action for the refund of taxes under the Internal Revenue Code, the plaintiff must be the taxpayer who has overpaid his *own* taxes." (emphasis added)). Here, it is undisputed that the IRS imposed the tax sanction against JMFH, not against the principals of the law firm individually. It is also undisputed that the closing agreement, signed by JMFH's authorized representative, was between the IRS and JMFH.

Even though Jewell ultimately contributed personal funds to JMFH's effort to pay the tax sanction, Jewel cites no authority for the proposition that this fact, standing alone, gives him standing to sue. We agree with the IRS that "the fact that each of the principals of JMFH agreed to contribute 1/3 of the sanction is simply irrelevant here." To the extent that any party was entitled to sue, JMFH is the appropriate party to raise its alleged injury as a result of the IRS's conduct.[2] And the record contains no evidence that Jewell obtained JMFH's causes of action as part of the distribution of

---

[2]Contrary to Jewell's assertions, the fact that JMFH had been dissolved is of no consequence to its ability to raise a claim against the IRS because Ark. Code Ann. § 4-26-1104(b)(4) permits a dissolved corporation to sue. *See* Fed. R. Civ. P. 17(b) (stating that a corporation's right to sue is determined by reference to state law).

the firm's assets. Because Jewell was not the taxpayer from whom the tax was collected, he cannot raise the rights of JMFH against the IRS. Accordingly, he lacks standing to sue the IRS for a refund. *See Murray*, 686 F.2d at 1325 n.8; *cf.* 20A Fed. Proc., L. Ed. § 48:1345 ("A shareholder cannot bring a refund suit for taxes paid on behalf of a corporation if the shareholder is not legally or contractually obligated to pay the corporate taxes.").

Jewell makes two arguments in support of his contention that he has standing. We find each to be unpersuasive. First, Jewell asserts that he, not JMFH, was the sponsor of the prototype plans, and, therefore, he has standing to sue the IRS. This argument is without merit, as Jewell has cited no authority for the proposition that being the sponsor of an IRS-approved prototype retirement plan automatically confers standing to sue for a tax refund. Even were we to so hold, JMFH sponsored the plans at issue, as demonstrated by the closing agreement and by Jewell's own repeated assurances to the IRS that JMFH continued to act as the sponsor of the plans.

Second, Jewell argues that the district court correctly held that he suffered a separate and distinct harm from the harm suffered by JMFH, and, therefore, he should be entitled to assert shareholder standing to sue. We disagree.

It is well established that a shareholder or officer of a corporation cannot recover for legal injuries suffered by the corporation. *See Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.*, 123 F.3d 1098, 1102 (8th Cir. 1997). But a shareholder may bring a direct suit when he asserts an injury "separate and distinct from that suffered by other shareholders." *Taha v. Engstrand*, 987 F.2d 505, 507 (8th Cir. 1993). Here, even assuming that the IRS caused Jewell to be injured in a legally cognizable way, the injury that Jewell suffered is indistinguishable from the injury suffered by JMFH as an organization. Second, if we were to accept Jewell's argument, personal financial loss alone would become the touchstone for shareholder standing. As we have noted elsewhere, "actions to enforce corporate

rights . . . cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in [the stockholder's financial loss]." *Potthoff v. Morin*, 245 F.3d 710, 716 (8th Cir. 2001).

### III. CONCLUSION

Accordingly, we reverse the judgment of the district court. Because we conclude that Jewell does not have standing to bring this suit, we need not reach the IRS's alternative argument.

RILEY, Circuit Judge, dissenting.

Because I believe the conclusions of the district court should be affirmed, I respectfully dissent.

### A. Standing

The first issue on appeal is whether Jewell had standing to bring his claim for a tax refund. As the majority correctly points out, the prudential limits of standing generally require plaintiffs to demonstrate they are asserting their own rights, and not the rights of a third party. See Powers v. Ohio, 499 U.S. 400, 410 (1991). This is equally true with respect to suits by corporate officers and shareholders. See Franchise Tax Bd. v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990). Equitable restrictions prohibit shareholders from bringing suit solely to enforce the rights of a corporation or to recover for injuries sustained by the corporation. Id. What the majority fails to embrace is Jewell's claim falls squarely within a recognized exception to this equitable restriction. This exception permits "a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." Id. Arkansas courts have repeatedly held a shareholder may bring a direct suit against a third party where the shareholder asserts a direct

injury which is separate and distinct from the harm caused to the corporation. See, e.g., Hames v. Cravens, 966 S.W.2d 244, 247 (Ark. 1998).

An analysis of the unique facts in this case shows Jewell had standing. On December 28, 2005, the Circuit Court of Pulaski County, Arkansas, determined JMFH had effectively dissolved as of July 25, 2002, "the last date upon which business of [JMFH] could have regularly been conducted." Upon the July 2002 dissolution, the shareholders individually took possession of the corporation's assets. As the district court found, JMFH had undergone a de facto dissolution and distribution long before Moser and Fletcher signed the IRS's closing agreement in January 2004. As a result, Jewell was forced to pay one-third of the JMFH penalty with his own funds, for which Jewell was not reimbursed, nor could he be reimbursed, by the defunct corporation. The IRS admitted knowing "JMFH was no longer in business," and one-third of the sanction would be paid by Fletcher's law firm and two-thirds of the sanction would be paid by JMFH with Jewell contributing, under protest, $8,933.33.

It is true Murray v. United States, 686 F.2d 1320, 1325 n.8 (8th Cir. 1982), says only "the taxpayer from whom the tax was allegedly wrongfully collected" has standing to sue for a refund. Contrary to the majority's conclusion, the $8,933.33 was, in fact, "collected" from Jewell, not from JMFH. Moreover, the $8,933.33 was not a tax. Jewell's payment was a sanction or penalty relating directly to Jewell's conduct in filing the amended plans.

The IRS also threatened not to join the settlement agreement if Jewell did not cooperate by (1) keeping his clients in the settlement, and (2) personally contributing to the penalty payment. The IRS informed Moser "the Closing Agreement was an all or nothing deal" and if Jewell did not "go along," then Jewell "had the potential of being sued by [Moser's and Fletcher's clients]." In the IRS answer to Jewell's complaint, the IRS admitted the settlement "agreement was structured as a 'blanket' agreement . . . that necessarily extended to all individual plans adopted by [JMFH's]

clients and was not limited only to plan clients of one stockholder." The IRS further acknowledged Jewell informed the IRS of Jewell's "opposition to the [settlement] agreement" and the "payment of any sanction."

The IRS is authorized under 26 U.S.C. § 7121(a) "to enter into an agreement . . . with any person relating to the liability of such person" respecting a tax liability. Jewell was such a person. Based upon the facts of this case, Jewell did sustain a direct injury separate and distinct from any injury sustained by the extinct JMFH, and Jewell had standing to file suit for a tax refund.

### B.     Malfeasance
Upon finding standing, the court should consider the second issue on appeal: whether the district court erred in holding the closing agreement was procured by the IRS through fraud, misrepresentation, or malfeasance. We review de novo a district court's grant of summary judgment. See Hawkeye Nat'l Life Ins. Co. v. AVIS Indus. Corp., 122 F.3d 490, 496 (8th Cir. 1997). "Summary judgment is proper only if the record, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id.; see also Fed. R. Civ. P. 56(c). Under 26 U.S.C. § 7121(b), a closing agreement may only be set aside if either party can demonstrate the existence of fraud, malfeasance, or misrepresentation of a material fact.

Between 1994 and 2000, Congress passed several pieces of legislation, collectively referred to as GUST, which impacted the retirement plans sponsored by JMFH. See Rev. Proc. 2000-20 § 1.01, 2000-6 I.R.B. 553. This legislation required several specific provisions to be included in JMFH's retirement plans for those plans to gain or retain qualified status for favorable tax treatment. See 26 U.S.C. 401(b); Rev. Proc. 2000-27 § 2.03, 2000-26 I.R.B. 1272; Rev. Proc. 2001-55 § 2.01, 2001-49 I.R.B. 552. The deadline for these plan changes was the later of February 28, 2002, or the last day of the first plan year beginning on or after January 1, 2001. See Rev.

Proc. 2001-55 §3.01, 2001-49 I.R.B. 552. If a sponsor submitted an amended prototype plan for IRS approval by December 31, 2000, the deadline was extended for those individual plans relying on the prototype plan until September 30, 2003, or the last day of the twelfth month after the IRS approved the amended prototype plan, whichever was later. See Rev. Proc. 2000-20 § 19.01, 2000-6 I.R.B. 553; Rev. Proc. 2003-72 §2.03, 2003-38 I.R.B. 578.

After this legislation was enacted, JMFH was required to amend the four prototype retirement plans which it sponsored for JMFH clients. In an effort to comply, Jewell drafted amendments and submitted the firm's four prototype plans to the IRS for approval on February 5, 2002, before the original deadline of February 28, 2002. See Rev. Proc. 2001-55 §3.01, 2001-49 I.R.B. 552. Because JMFH's prototype plans were not submitted by December 31, 2000, the individual retirement plans did not qualify for the September 30, 2003 extension, and each had to be submitted by the later of February 28, 2002, or the last day of the first plan year beginning on or after January 1, 2001. See Rev. Proc. 2000-20 § 19.07, 2000-6 I.R.B. 553.

JMFH could not make the required amendments to the individual plans until the IRS issued confirmation letters informing JMFH whether its prototype plans were acceptable. JMFH was forced to wait five months and twenty days before the IRS responded to JMFH's timely request for confirmation letters. When the IRS finally responded on July 25, 2002, the IRS asked JMFH to make minor changes to the prototype plans, changes consisting often of typographical errors. Jewell made the requested alterations and forwarded the changes to the IRS the following day, July 26, 2002. Over two months later, on Friday, October 4, 2002, the IRS asked JMFH to make further inconsequential changes to its prototype plans. Jewell provided these changes to the IRS on the next working day, Monday, October 7, 2002. After eight months, the IRS issued opinion letters on October 9, 2002, approving JMFH's amended prototype plans.

-11-

Because the IRS took over eight months to review JMFH's timely prototype plans, Jewell faced a difficult situation. Jewell could either (1) begin submitting JMFH's individual retirement plans before he received confirmation letters, without the changes eventually requested by the IRS, or (2) wait until the IRS issued confirmation letters, and then submit the individual plans after the deadline, which could result in those individual plans losing qualified status and favorable tax treatment. Believing he had an obligation to his clients, Jewell chose to begin submitting the individual retirement plans. As a consequence, some of the individual plans were submitted without one or more of the corrections the IRS later requested. Despite Jewell's attempts to ensure timely submission of the individual plans, the IRS claimed over sixty of the individual plans had not fully incorporated the required amendments by the applicable deadline.

The IRS sent Jewell a letter on May 23, 2003, informing Jewell of seven "deficiencies." Each of the challenged plans had at least one of these deficiencies, making the plans "late-amenders" under GUST. Examples of the deficiencies include typographical errors, such as referencing an effective date of "August 5, 1997," instead of "August 6, 1997," and using the word "month" to specify a period of time instead of the phrase "calendar year month." Some deficiencies Jewell had adopted from the IRS' List of Required Modifications and still others were not deficiencies at all, but were mistakes made by the IRS.

The May 23, 2003 letter advised Jewell to proceed under the Correction on Audit Program whereby JMFH would enter into a closing agreement which would grant relief from disqualification to each of JMFH's clients who adopted individual plans based upon one of the firm's prototypes. If JMFH entered into such an agreement and paid a cash sanction, the IRS would treat the prototype as if it had been submitted by December 31, 2000, thereby allowing the individual plans an extension under Rev. Proc. 2002-73. The IRS further notified Jewell, if an agreement could not be negotiated, the IRS would individually process the pending client plans as requests

by late-amenders under GUST, subjecting many JMFH clients to disqualification and unfavorable tax treatment.

Jewell responded to the May 23, 2003 letter by indicating his willingness to negotiate an agreement. The IRS then proposed a $71,000 sanction, which did not "bear a reasonable relationship to the nature, extent, and severity" of the deficiencies, nor did it take "into account the extent to which correction occurred before audit," as required by IRS Revenue Procedures pertaining to the Correction on Audit Program. See Rev. Proc. 2003-44 § 1.03, 2003-25 I.R.B. 1051. Negotiations continued between Jewell and the IRS until Jewell was excluded from the negotiations by his former partners. The IRS reached a closing agreement with Jewell's former partners, describing the agreement as between the IRS and JMFH, the dissolved corporation. The IRS agreed to grant an extension to JMFH's individual client plans in exchange for $26,800. Jewell did not sign the closing agreement, and when Jewell resisted payment under the agreement, IRS agents threatened that if Jewell removed his clients from consideration under the agreement, or if Jewell failed to pay one-third of the penalty, the IRS would conduct individual investigations on each of Jewell's client plans and also decline to enter into the agreement with JMFH, exposing Jewell to lawsuits from JMFH's clients. Jewell then, under protest, paid $8,933.33 of his own funds to cover one-third of the sanction.

The United States Tax Court recognizes, "in determining whether closing agreements will be set aside the usual rules as to fraud and misrepresentation apply." Bennett v. Commissioner, 56 T.C.M. (CCH) 796 (1988). "In order to establish fraud for purposes of setting aside a closing agreement," a claimant must prove the "allegedly fraudulent misrepresentation: (1) [c]oncerned material facts; (2) was knowingly false; (3) was made with the intention that it be relied on in good faith by the other party without knowledge of its falsity; and (4) proximately caused injury or damages to the innocent party." Id. (citing Boatmen's National Co. v. M.W. Elkins & Co., 63 F.2d 214, 216 (8th Cir. 1933)). "In order to establish a misrepresentation

-13-

of a material fact sufficient to set aside a closing agreement pursuant to section 7121(b)," the claimant must prove "the representation made by one party contained incorrect or incomplete information or computations regarding the express terms reflected in the proposed closing agreement and that such information was in good faith and detrimentally relied upon by the other party in entering into the closing agreement." Id. Malfeasance is a "wrongful or unlawful act; esp[ecially] wrongdoing or misconduct by a public official." *Black's Law Dictionary* 976 (8th ed. 2004). In view of the IRS's conduct, the district court set aside the closing agreement because the agreement was induced by the IRS's fraud, misrepresentation of material fact, or malfeasance.

The IRS's malfeasance began when it started pressuring Jewell concerning these relatively trivial deficiencies in JMFH's plans. The district court found a great majority of JMFH's individual plans were timely, the few plans which were late were late by only a few days, and all of the plans were substantially correct. The record supports the district court's findings and its conclusion a "good faith, quality submission mitigates the need for an IRS imposed penalty." Jewell v. United States, No. 4:06-CV-684, slip op. at 9, 2007 WL 4150206, at *4 (E.D. Ark. Nov. 19, 2007). The IRS conceded the individual employer plans Jewell submitted were a bona fide effort to comply with GUST. The extended delays in response time were created by the IRS, not by Jewell or JMFH. As the district court aptly explained, "The IRS cannot be allowed to accept timely adoptions, ask for minor changes to those adoptions, and then declare the plan late and demand a penalty when the employer makes the IRS-requested changes." Id. at *6. I agree.

When the IRS induced Jewell to pay one-third of the sanction, the district court accurately described this conduct as "extortionary, deplorable, and wrong." Id. at *3. In the May 23, 2003 letter, the IRS informed Jewell it would be in his benefit to negotiate an umbrella agreement, and if he failed to do so, the IRS would individually process the pending client plans as requests by late-amenders under GUST, subjecting

many JMFH clients to disqualification and unfavorable tax treatment. This compulsion was strengthened by a second letter dated August 22, 2003, in which the IRS notified Jewell the only way he could avoid "the harsh tax consequences of plan disqualification that would potentially be incurred by hundreds of employers, most of whom are very small entities" would be to pay a sanction under a closing agreement. Jewell's choice was either to enter into an unfair closing agreement and pay a sanction or subject his clients to severe tax consequences. When Jewell was excluded from the negotiation process, Jewell suggested his clients should be removed from the agreement. The IRS threatened, if Jewell removed his clients from consideration under the agreement, or if Jewell failed to pay one-third of the penalty, the IRS would decline to enter into the agreement with JMFH, exposing Jewell personally to lawsuits from Moser's and Fletcher's clients.

The IRS's conduct exceeded its legal authority and was wrongful. Employees of the IRS are public officials and should be held to a higher standard than their conduct displayed in this case. Acting the part of a playground bully does not become the IRS or any public servant. This malfeasance justifies setting aside the closing agreement and returning Jewell's money.

For the foregoing reasons, I would affirm the district court's grant of summary judgment in favor of Jewell.

_____