# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1700

_____

| | | |
|---|---|---|
| Air Line Pilots Association International, | * * * | |
| Appellee, | * * | Appeal from the United States |
| v. | * * | District Court for the Eastern |
| | * | District of Missouri. |
| Trans States Airlines, LLC, | * * | |
| Appellant. | * | |

_____

Submitted: December 15, 2010
Filed: May 3, 2011

_____

Before RILEY, Chief Judge, BEAM and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

Trans State Airlines, LLC (TSA) appeals the district court's[1] grant of summary judgment to Air Line Pilots Association International (ALPA) enforcing an arbitrator's award of backpay to pilot Captain Paul Hopkins after TSA fired him. TSA contends the award violates the public policy against large loans to union officials

_____

[1]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

embodied in the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 401-531. We affirm.

## I.      BACKGROUND

TSA is a "common carrier by air engaged in interstate or foreign commerce" within the meaning of 45 U.S.C. § 181 of the Railway Labor Act (RLA). ALPA is an unincorporated labor organization representing commercial pilots, within the meaning of 45 U.S.C. §§ 151, Sixth, and 181 of the RLA. ALPA represents TSA's pilots, including Hopkins.

TSA and ALPA are parties to a collective bargaining agreement (CBA), which provides for a System Board of Adjustment (Board) to resolve grievances. The Board has jurisdiction over disputes arising from grievances as well as the interpretation and application of the CBA.

Hopkins was a TSA pilot from July 13, 1998 until March 16, 2005, when TSA fired him for misuse, abuse, and participation in the falsification of an employee pass travel ticket. On March 18, 2005, ALPA filed a grievance with TSA under Section 20 of the CBA, contending Hopkins's termination was without just cause. When TSA denied the grievance, ALPA submitted the grievance for arbitration before the Board.

In April 2005, while Hopkins's grievance was pending, ALPA's Executive Council concluded TSA terminated Hopkins for his union activity. Hopkins served as chairman of ALPA's Local Executive Committee and as a captain representative for most of the time relevant to the award. Pursuant to Section 60.M.5 of ALPA's Administrative Manual, which authorizes payments to union officials who have been suspended or discharged because of authorized union activities, the Executive Council approved payment to Hopkins for 85 hours of "flight pay loss" per month. Between March 2005 and November 2007, ALPA paid Hopkins $161,798.87.

Section 60.M.5 provides that monies received by a discharged member from his carrier as a result of a grievance decision shall be repaid to ALPA. Before the Board, TSA argued the payments to Hopkins were a loan to a union officer in excess of $2,000 in violation of 29 U.S.C. § 503(a). The Board rejected TSA's argument because it concluded Section 60 did not obligate Hopkins to repay ALPA unless he received a make-whole remedy from TSA.

On May 8, 2006, the Board sustained Hopkins's grievance, and ordered TSA to reinstate Hopkins and pay his lost wages and benefits with interest. TSA refused to comply. On June 5, 2006, ALPA filed this action in the district court, seeking to enforce the award. TSA filed a counterclaim to vacate the award, alleging the arbitrator exceeded his jurisdiction and the award contained factual errors and violated public policy.

On September 25, 2007, the district court ordered TSA to reinstate Hopkins with backpay as determined by the Board. The district court retained jurisdiction to ensure compliance with its judgment. After the district court's decision, TSA offered to reinstate Hopkins, but Hopkins declined.

On December 11, 2007 and February 22, 2008, the Board held hearings to determine the amount of backpay and benefits to award Hopkins. At the hearings, TSA reasserted its position that the Section 60 payments were an illegal loan in violation of the LMRDA. On December 1, 2008, the Board again rejected TSA's argument—ultimately awarding Hopkins $162,249.56 plus interest.

TSA moved the district court for summary judgment with respect to Hopkins's award, arguing enforcement would cause a criminal violation of the LMRDA. ALPA filed a cross-motion to enforce the award and seeking sanctions. On February 25, 2010, the district court denied TSA's motion and granted ALPA's motion in part, ordering TSA to pay the award, but denying sanctions. TSA appeals.

## II.    DISCUSSION

### A.    Standing

ALPA contends TSA lacks standing to challenge Hopkins's award on public policy grounds.  To satisfy the standing requirement of Article III of the United States Constitution, TSA must demonstrate it "suffered an 'injury in fact,'" that is "fairly traceable to the challenged action," and "redressable by a favorable decision."  Jewell v. United States, 548 F.3d 1168, 1172 (8th Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

TSA contends "[e]nforcing the [d]istrict [c]ourt's Order will cause the ALPA/Hopkins financial arrangement to ripen into one that is plainly unlawful under the LMRDA."  According to TSA, Hopkins's award "effectively orders TSA to participate in an illegal act"—an injury traceable to the district court's enforcement of the award, and fully redressable by an order vacating the award.  We agree with TSA that its public policy challenge to Hopkins's award satisfies the standing requirement of Article III.

"In addition to the immutable requirements of Article III, 'the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.'"  Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc., 454 U.S. 464, 474 (1982)).  One such requirement is the doctrine "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit."  Id.  "Whether a plaintiff's interest is arguably . . . protected . . . by the statute within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies."  Id. at 175-76 (quoting Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)).

In cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone-of-interest] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399-400 (1987) (footnote omitted). "[T]he salient consideration . . . is whether the challenger's interests are such that they 'in practice can be expected to police the interests that the statute protects.'" Amgen, Inc. v. Smith, 357 F.3d 103, 109 (D.C. Cir. 2004) (quoting Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1075 (D.C. Cir. 1998)).

Section 503(a) provides

No labor organization shall make directly or indirectly any loan or loans to any officer or employee of such organization which results in a total indebtedness on the part of such officer or employee to the labor organization in excess of $2,000.

ALPA argues TSA's claims fall outside the zone of interests protected by § 503(a) because "[§] 503(a) applies to unions and their members, not to employers." In response, TSA emphasizes Congress enacted the LMRDA, in part, to ensure "labor organizations, employers and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations" and "to eliminate or prevent improper practices on the part of labor organizations, employers . . . and their officers and representatives which distort and defeat the policies of the . . . [RLA]." 29 U.S.C. § 401(a), (c).

Section 503(a) does not specifically authorize an action by an employer asserting it is being compelled to repay an illegal loan, but TSA's claims are not so marginally related to or inconsistent with the purposes implicit in the statute that it

cannot reasonably be assumed Congress intended to permit TSA's suit. The LMRDA is "broad in its reach" and application. Johnson v. Nelson, 325 F.2d 646, 650 (8th Cir. 1963). "The legislative history of the [LMRDA] demonstrates that Congress intended that it should not be interpreted by the courts narrowly or strictly." Id. See also United States v. Goad, 490 F.2d 1158, 1162 (8th Cir. 1974) ("Section 501 should be interpreted broadly in order to insure that elected union officials fulfill their responsibilities as fiduciaries to their members, guard union funds from predators, and keep intact all such funds except those expended in the legitimate operation of the union's business.").

Assuming ALPA's payments to Hopkins constitute an illegal loan, TSA, through the award, becomes an indirect means of repaying Hopkins's debt. Though TSA's public policy challenge serves TSA's pecuniary interest, it also upholds the statutory purpose of preventing improper loans to union officials. By its involuntary involvement in what it argues is an illegal transaction between ALPA and its officers, TSA is in a unique position to police the interests § 503(a) protects. Because TSA's interests are congruent with the purposes of § 503(a), TSA has standing to pursue this appeal.

### B.     Standards of Review

"We apply 'ordinary, not special, standards when reviewing district court decisions upholding arbitration awards.'" MidAm. Energy Co. v. Int'l Bhd. of Elec. Workers Local 499, 345 F.3d 616, 619 (8th Cir. 2003) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 948 (1995)). "We review the grant of summary judgment de novo even though the enforcement of an arbitration award is involved." Id. "Once [a] public policy question is raised, we must answer it by taking the facts as found by the arbitrator, but reviewing [the arbitrator's] conclusions de novo." Iowa Elec. Light & Power Co. v. Local Union 204, Int'l Bhd. of Elec. Workers, 834 F.2d 1424, 1427 (8th Cir. 1987).

ALPA acknowledges we ordinarily conduct the public policy review of an arbitration award de novo, but contends "where (as here) parties submit to arbitration matters that otherwise would be for judicial decision, the court's review of the arbitration decision is limited to whether the decision was made in 'manifest disregard' for the law." We disagree.

First, we reject ALPA's contention that the parties to a collective bargaining agreement can agree to limit judicial review of public policy. We have an absolute duty to determine whether an award violates public policy before enforcing it. See Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83-84 (1982).

Second, the cases on which ALPA relies, most of which do not involve a public policy question, do not support ALPA's assertion that manifest disregard is the standard of review for a public policy challenge to an arbitration award under the RLA. The cited cases merely discuss our previous recognition of an arbitrator's manifest disregard for the law as an extremely narrow, nonstatutory ground for vacating an arbitration award under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq. See, e.g., St. John's Mercy Med. Ctr. v. Delfino, 414 F.3d 882, 884 (8th Cir. 2005). We have since explained the Supreme Court's decision in Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 586-87 (2008), eliminated judicially created vacatur standards under the FAA, including manifest disregard for the law. See Med. Shoppe Int'l, Inc. v. Turner Invs., Inc., 614 F.3d 485, 489 (8th Cir. 2010) (holding "an arbitral award may be vacated only for the reasons enumerated in the FAA"); Crawford Group, Inc. v. Holekamp, 543 F.3d 971, 976 (8th Cir. 2008) (same).

ALPA fails to explain how a defunct vacatur standard under the FAA determines the standard of review for the distinct public policy exception to the otherwise narrow grounds on which a court may set aside an arbitration award under the RLA. See Stroh Container Co. v. Delphi Indus., Inc., 783 F.2d 743, 749-50 (8th Cir. 1986) (discussing manifest disregard and public policy as distinct exceptions to

-7-

the statutory restraints on judicial review under the FAA); <u>Union Pac. R.R. v. United Transp. Union</u>, 3 F.3d 255, 260-62 (8th Cir. 1993) (holding that arbitration awards under the RLA are subject to public policy review and conducting de novo review). Manifest disregard does not apply to this appeal.

### C.     Issue Preclusion

In October 2007, ALPA obtained an award for another TSA pilot, Jason Kagan, for improper discharge under the same CBA.  In contesting Kagan's grievance, TSA argued ALPA's payments to Kagan were an illegal loan and any backpay award would violate public policy.  After the arbitrator rejected TSA's argument, TSA and ALPA entered into a settlement agreement and TSA did not seek judicial review of the award.

ALPA asserts the Board's conclusion in the Kagan arbitration precludes TSA from challenging the legality of Hopkins's award.  "Under [the doctrine of] issue preclusion, also known as collateral estoppel, 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" <u>W.F.M., Inc. v. Cherry Cnty., Neb.</u>, 279 F.3d 640, 643 (8th Cir. 2002) (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)).

"[A]n arbitrator generally has the power to determine whether a prior award is to be given preclusive effect."  <u>Trailways Lines, Inc. v. Trailways, Inc. Joint Council</u>, 807 F.2d 1416, 1425 (8th Cir. 1986); <u>accord</u> <u>Am. Nat. Can Co. v. United Steelworkers of Am.</u>, 120 F.3d 886, 891-93 (8th Cir. 1997).  <u>See</u> <u>also</u> <u>W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers</u>, 461 U.S. 757, 764-65 (1983) (holding an arbitrator's conclusion that he was not bound by a prior arbitrator's decision was binding on the federal courts).

But, where, as here, a challenge to an arbitration award raises a question of public policy, we do not give a prior award, specifically one which has not been subject to judicial review, any preclusive effect on a matter of public policy. See W.R. Grace, 461 U.S. at 766. "Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, 'the question of public policy is ultimately one for resolution by the courts.'" Iowa Elec., 834 F.2d at 1427 (quoting W.R. Grace, 461 U.S. at 766)). We conclude the arbitrator's unreviewed decision in the Kagan arbitration does not preclude TSA's public policy challenge to Hopkins's award.

### D.    Section 60 Payments

TSA contends enforcing the award will cause the financial arrangement between ALPA and Hopkins to ripen into an unlawful loan under § 503(a) because Hopkins agreed to reimburse ALPA from any award he received from TSA. "[A] court may refuse to enforce [an arbitration award under the RLA] where a public policy would be violated by enforcing the [award]." Union Pac. R.R., 3 F.3d at 260. "Such a public policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W.R. Grace, 461 U.S. at 766 (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)). We agree with TSA that § 503(a) manifests a well-defined public policy prohibiting certain loans to union officials. Thus, we must consider whether ALPA's payments to Hopkins constitute such an improper loan.

The LMRDA does not define the term "loan" and the courts have not had much occasion to interpret the term under § 503(a). In deciding a series of salary advances to a union official "constitute[d] a loan within the meaning of 29 U.S.C. § 503(a)," one of the only courts to interpret the term defined a loan as the "[d]elivery by one party to and receipt by another party of a sum of money, upon agreement, express or implied, to repay it with or without interest." United States v. Int'l Bhd. of Teamsters,

817 F. Supp. 337, 344 (S.D.N.Y. 1993) (quoting Black's Law Dictionary 936 (6th ed. 1991)), aff'd, 14 F.3d 183, 184 (2d Cir. 1994).

Relying on the same definition, TSA contends Hopkins's obligation to repay the $161,798.87 in "flight-pay loss payments" received from ALPA constitutes an illegal loan. The Board accepted TSA's proffered definition, but determined ALPA's payments to Hopkins were not a loan because the arrangement did not require Hopkins to repay the amounts he received "unless and until [Hopkins] receive[d] a make-whole remedy payment from [TSA]." The district court reached the same conclusion, stating it "was unable to find any definition of the term 'loan' that included a contingency for repayment."

While the general definition of loan adopted by the Board is consistent with our precedent, the Board and district court's specific reasoning and contingency application are not. See U.S. Dep't of Health & Human Servs. v. Smith, 807 F.2d 122, 124-25 (8th Cir. 1986). The conclusion that the repayment contingency prevented ALPA's financial arrangement with Hopkins from being a loan is contrary to our precedential holding that "a loan is no less a loan because its repayment is made contingent." Id. at 125 (internal marks and quotation omitted). The ALPA financial arrangement, which strongly resembles a contingent loan, comes dangerously close to violating § 503(a). The Section 60 payments involve ALPA's delivery of a sum of money to Hopkins on his express agreement to repay the amounts advanced if he receives an award. The contingent nature of Hopkins's repayment obligation, by itself, does not prevent the payments from falling within the broad definition of a loan under the LMRDA.

Despite our concern about the potential risk that unions and employers could attempt to evade the prohibitions of the LMRDA through financial arrangements similar to ALPA's Section 60 payments, we conclude ALPA's financial arrangement with Hopkins was not an illegal loan. In determining whether a particular financial

-10-

arrangement constitutes a loan, we consider not only the form of the arrangement, but also the intent of the parties. See In re Renshaw, 222 F.3d 82, 88 (2d Cir. 2000) (quoting In re Grand Union Co., 219 F. 353, 356 (2d Cir. 1914)); cf. Smith, 807 F.2d at 124 (similar). TSA has failed to adduce evidence establishing ALPA and Hopkins intended the Section 60 payments to be a loan.

To the contrary, in analyzing ALPA's intent in using the term "flight pay loss," the Board found "the usage of flight pay loss in ALPA is understood as the wage loss incurred by [Hopkins] where flight time was denied him by [TSA]'s unjust action in discharging him." The Board determined "[t]he sole purpose of Section 60 is to protect the elected leaders of ALPA members from discriminatory disciplinary treatment attributable to anti-union animus" by TSA and that "[w]ithout such indemnification of risk to their careers," pilots "would hesitate to take on the responsibilities of union leadership." The Board concluded "[t]he facts strongly suggest that this kind of protection of union leadership is well warranted on this property," in light of TSA's treatment of union officials, including Hopkins.

The facts as found by the arbitrator, which we are bound to accept, support the conclusion the Section 60 payments Hopkins received are more in the nature of an executive benefit, necessary to induce pilots to serve as leaders in the union, than a loan. Given the arbitrator's view of the facts, the financial arrangement between ALPA and Hopkins is analogous to a salary continuation plan with ALPA retaining subrogation rights. Under such a plan, an employer agrees, as an additional benefit of employment, to continue paying an employee's salary for a specified time following the occurrence of some future event that prevents the employee from working, such as retirement, death or disability. See American Heritage Dictionary of Business Terms 464 (2009). Like a salary continuation plan, the Section 60 payments effectively continued Hopkins's salary for the time he was unable to work after TSA improperly terminated him for his union activities. This interpretation conforms to the arbitrator's factual findings of the intent of ALPA and Hopkins.

Though not dispositive, the fact that Hopkins's obligation to repay ALPA is conditioned on an uncertain event outside Hopkins's and ALPA's control also supports the Board's finding that the purpose of the payments is to protect authorized union activity. This lack of control, combined with the purpose and structure of the Section 60 payments, which were made pursuant to the ALPA administrative manual and reviewed by ALPA's executive council, weigh against finding the payments were an illegal loan.

## III.  CONCLUSION

We agree with the Board and the district court that enforcement of this award does not violate the public policy of § 503(a). We affirm the district court's ultimate judgment.

_____